RUST v. McWILLIAMS et al.

(First Division. Juneau. July 11, 1908.)

No. 492A.

1. MINES AND MINERALS (§ 55*)—CONTRACTS—CONSTRUCTION—FOR-
FEITURE.

The owners of the Aurora Borealis mining claims sold them to
purchasers, who made first payments and agreed to make defer-
red payments and to erect a 10-stamp mill on the premises with-
in a fixed time. It was also agreed that on failure to make the
deferred payments the buyer should forfeit the payments so
made, and the property and machinery upon the property of the
seller, and be released from all claims and demands arising from
the contract. *Held* that, upon abandonment of the premises by
the purchaser and refusal to keep or comply with his contract,
the forfeiture took place, though the period limited for payment
had not fully expired.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig.
§ 55.*]

2. FIXTURES (§ 8*)—CONTRACTS—CONSTRUCTION—FORFEITURE.

Where a contract provided for a forfeiture of "property and
machinery upon the property of the said first parties" for fail-
ure of contract, *held*, that a new, uncrated 10-stamp ore mill,
not fixed to the real estate, was forfeited as a part of the ma-
chinery.

[Ed. Note.—For other cases, see Fixtures, Dec. Dig. § 8.*]

3. CONTRACTS (§ 170*)—CONSTRUCTION.

The construction which the parties have by their acts placed
upon an ambiguous instrument is entitled to great, if not con-
trolling, weight in determining its proper construction.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 753;
Dec. Dig. § 170.*]

Plaintiff brings this action to replevin a 10-stamp mill of the
Allis-Chalmers type, lying crated on the mining claims known
as the Aurora Borealis properties, near Yankee Cove, in this

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

3 A.R.—36

division of the district of Alaska. The plaintiff alleges in his complaint that he has been the owner of the machinery in question ever since the 11th day of July, 1905, which he asserts that he purchased on that day at an execution sale held at the point where the property in question lies, near Yankee Cove, the property having been attached by the United States marshal on April 3, 1905, in an action between the B. M. Behrends Mercantile Company and the Bessie Gold Company, then pending, and that the property was in the possession of the marshal at the time of the sale. He further alleges that on September 5, 1905, defendants took the property into their possession, and have since wrongfully and unlawfully continued to hold possession thereof, and have prevented him by force and threats of violence from retaking the property, gaining access to it, or removing it from the vicinity of Yankee Cove. The value of the property in controversy is alleged to be $10,000, and plaintiff asserts that the defendants cannot respond in damages.

Defendants admit that they are in possession of the property, but deny all the other allegations of the complaint. Their answer alleges that neither the plaintiff nor the marshal was ever in possession of the property, but that at the time of the levy and sale the machinery was the property of the defendants, and not the Bessie Gold Company, and that it was not subject to levy in an action against the company. For an affirmative defense they set up their ownership in certain lode mining claims known as the Aurora Borealis group, and that on October 29, 1902, an agreement or option was executed between them and the Bessie Gold Company for the sale of those claims; that under this agreement the Bessie Gold Company was to erect upon the claims a 10-stamp mill, and was to pay the purchase price of the claims in a certain manner before November 1, 1905; and that, in the event of the company's defaulting in the full sum on that date, it should forfeit, not

only all the payments made, but also all the property, machinery, etc., which it should have placed upon the ground. They also allege that the Bessie Gold Company laid this 10-stamp mill down on the property and commenced the construction of a mill building, but that it eventually failed to carry out its agreement, and thereby forfeited the property, and that, consequently, the property was not subject to levy or attachment, and that the Bessie Gold Company had no interest or legal estate in the subject thereof, but that, on the contrary, the said 10-stamp mill was the sole and exclusive property of the defendants by reason of the forfeiture. It is also alleged in the answer that the Bessie Gold Company, and not this plaintiff, is the real party in interest, and that, for the purpose of cheating and defrauding defendants, that company conspired with W. R. Rust, the plaintiff, and induced him to become the nominal purchaser of the property at the execution sale, while in fact the Bessie Gold Company was the real purchaser. Plaintiff, in his reply, puts the allegations of the answer in issue.

Shackleford & Lyons, for plaintiff.
Heid & Day, for defendants.

GUNNISON, District Judge. The facts, as disclosed by the evidence, seem to be as follows: These defendants were, on October 29, 1902, and for a considerable time prior to that date, the owners of a group of mining claims known as the Aurora Borealis properties, situated some three or four miles from the beach of Yankee Cove. Some time prior to that date, and on the 8th day of December, 1897, these defendants had given to one A. Nappack, of Portland, Or., a mortgage for $2,000 upon these properties. This mortgage was, on December 30, 1897, duly filed for record in the office of the recorder of that district, and on October 29, 1902, it was still of record and unsatisfied.

For several months prior to October 29th negotiations were pending between these defendants and the men who afterwards became the directors of the Bessie Gold Company for the purchase of the Aurora Borealis properties. Shortly before that date, the Bessie Gold Company was organized, with E. M. Shelton as its president and one of its directors, and the negotiations which had been carried on by Mr. Shelton and others as the incorporators of the company ended in an agreement of purchase or option on these properties. From the record in this case it appears that the men who were conducting the negotiations and afterwards became directors in the company, or some of them, at least, were personally and actually cognizant of the existence of this mortgage between the owners of the Aurora Borealis properties and Nappack. Shelton in his deposition testified that he personally never heard of this mortgage until some time after the agreement had been signed and the company had taken over the property. He also testifies that the record title of the property had been examined before the agreement was entered into. As the mortgage was of record during all the progress of the negotiations prior to the entering into the agreement, its existence must have been disclosed by examination of the record itself. It also appears, from the testimony of Frank Bach, one of the directors of the company, that he knew of the mortgage before the agreement was finally made, and also that he, Mr. Shelton, and one P. S. Early, were present when this mortgage was discussed.

The portions of the contract which are germane to the present case and upon which the defendants rest their contention of ownership are as follows:

"The second party [the Bessie Gold Company] shall erect upon said property, not later than the 1st day of November, 1903, a 10-stamp mill, with power to operate the same, and a tram or road, the whole amount to be so expended not to be less than the sum of $10,000, by the date aforesaid, to wit, the 1st day of November, 1903."

The next portion of the agreement bearing on the case is as follows:

"That the second party shall, at the end of each month, pay to the duly authorized agent of the said first party one-fourth of the net proceeds of all sums received from working the ores of the Bessie group and one-half of the net proceeds of all sums received from mining on the claims of the said first parties, for the period of two years from the 1st day of November, 1903, until the whole amount of said $60,000 is paid as herein provided, and no more."

The two clauses relating to forfeiture are:

"It is further agreed by the parties hereto that, in the event the payments made in the manner herein provided shall not amount to the whole sum of $60,000 within two years from the 1st day of November, 1903, to the 1st day of November, 1905, and the said second party shall fail on said last-mentioned date to pay the balance due, then the said second party shall forfeit the payments so made, and the property and machinery upon the property of the said first parties, and be released from all claims and demands arising under this contract.

\*       \*       \*       \*       \*       \*       \*       \*       \*

"It is further agreed between the parties hereto that no forfeiture shall be claimed or shall be binding upon either of the parties hereto to any of the terms or conditions of this agreement until the party claiming such forfeiture shall have first given sixty days' notice in writing to the party in default, during which time the said party in default shall be permitted to make good such breach or forfeiture."

Upon the signing of the agreement from which we have just quoted, the Bessie Gold Company went into possession of the claims and proceeded to work. A 10-stamp mill of the Allis-Chalmers type was purchased, and early in the spring of 1903 was delivered on the beach at Yankee Cove. The company then intended to build a plank road, or tramway, from the beach to the mining property by the middle of the summer; but this was not completed until the latter part of November of that year, and the machinery composing the stamp mill was allowed to remain crated at the beach where delivered until

early the next spring, when it was hauled to the site where it was intended to put it in place. A mill structure had been partially erected when the crated machinery arrived; but it was never completed, nor was the machinery ever uncrated or set up. The only articles unboxed or taken from the crates were some bolts which were used on the mill structure, two rubber concentrator belts, which were unboxed and hung over the rafters of the mill, in order to preserve them, and one six-foot flywheel, which was not used as part of the stamp mill, but was taken to a sawmill on the property and utilized there. Shortly after this, the employés of the company were discharged and the work upon the property ceased. No part of the purchase price had been paid up to that time; nor, in fact, was anything ever paid on the purchase price, so far as the record in this case discloses. Mr. Shelton in his testimony states the reason for the cessation of the work and the abandonment of the property to be that the company had just discovered that these properties were incumbered by the Nappack mortgage.

On October 28, 1904, these defendants, the owners of the Aurora Borealis properties, prepared a notice of forfeiture, the duplicate of which is in evidence (Defendants' Exhibit No. 1). This notice was on October 31st mailed, registered, to E. M. Shelton, president of the Bessie Gold Company, and was received by him, as shown by the registry receipt (Defendants' Exhibit No. 3), on the 7th day of November, 1904. The Bessie Gold Company made no attempt to comply with the provisions of the notice, and took no action whatever with regard to the property, not even attempting to withdraw therefrom any of the materials or machinery which it had placed upon the ground. These defendants went again into possession of the mining properties. Some four months after the service of this notice on the Bessie Gold Company, and on March 29, 1905, the B. M. Behrends Mercantile Company, of Juneau, com-

menced an action against the Bessie Gold Company to recover
the sum of $338.33. On the same day, at the instance of the
plaintiff in that action, a writ of attachment was issued out of
the court, and on the 3d day of the following month this writ
was levied upon the crated 10-stamp mill at Yankee Cove.
Two days later the summons and complaint were duly served
upon the company's representative at Juneau. No defense was
interposed by the Bessie Gold Company, and on May 6, 1905,
default was entered against it. The judgment was signed on
June 14th, and the execution issued a week later. Notice of
the sale to occur on the 11th of July was duly posted. On
July 9th, two days before the date fixed for the sale, these de-
fendants, claiming to own the property by virtue of the for-
feiture, caused to be served upon Behrends Mercantile Com-
pany, the plaintiff in the attachment suit, and upon the United
States marshal who had made the levy, a notice, in which they
set up their ownership to the property and demanded its re-
lease from the writ. This notice is in evidence as Defendants'
Exhibit No. 4. No attention was paid to this notice, and on
July 11, 1905, the property was sold at auction, where it lay on
the ground, to the highest bidder. Several persons were pres-
ent at the sale; but the record discloses that only two bid upon
the property—one of them, P. S. Early, one of these defend-
ants, and the other, John McLaughlin, who made the success-
ful bid in the name of W. R. Rust, this plaintiff.

Since the defendants contend that W. R. Rust is not the
real party in interest in this case, it may be well at this point
to examine his connection and that of Mr. Shackleford, who
employed McLaughlin to make the bid, with the transaction.
The evidence seems to show that at this time L. P. Shackle-
ford had been the attorney for the Bessie Gold Company in
one or two cases, and was at the time in question attorney of
record in one case. Personally he was not then acquainted
with Rust, but had been directed by Mr. Bogle, a former law

partner and business associate of one Charles Richardson, who was treasurer and a director in the Bessie Gold Company, and with whom Shackleford was acquainted, to have the property bid in for Rust. The direction from Bogle to Shackleford, as testified by the latter was "that Mr. Rust would buy the property, and to have the property bid in for Mr. Rust." The understanding was between Shackleford and Bogle that the property was to be bid in by Shackleford, and that he (Shackleford) was to draw on Richardson, as he was unacquainted with Rust, and as Richardson was representing Rust. It also appears that the attention of Rust was called to this property, and the sale by Richardson, in the former's office in Tacoma, and that Rust, being informed as to the character of the property, determined to buy it, though from the testimony it appears that he had no clearly defined plan as to where he should use it. Pursuant to these instructions, Mr. Shackleford employed John McLaughlin, of Juneau, to go to Yankee Cove and there bid on the property in the name of Rust. He was authorized to bid, as he says, "a little more than the judgment and costs." The property having been struck off to Rust, Shackleford paid for it with his own check, and thereupon drew on Richardson, and advised him that the property had been purchased. The draft was honored, and thereupon Rust reimbursed Richardson with his check, which is in evidence, marked Plaintiff's Exhibit F. The receipt for the property and the certificate of purchase were each made out to Rust. Thereunder the plaintiff, through Shackleford, attempted to take possession of the property; but possession was refused him by the defendants, and this action was commenced. There is no evidence upon the issue made by the pleadings that the defendants prevented the taking of the machinery by force and violence, or that they made threats to use force or violence, though it is conceded that the defendants refused to surrender possession of the property. Neither of the contentions of the defendants, that Rust is not the real

party in interest, or that there was fraud practiced by the Bessie Gold Company and the plaintiff, are, in my opinion sustained by the evidence.

The case seems to turn on a construction of the agreement between the owners of the mining property and the Bessie Gold Company, particularly upon that clause which provides that upon failure to conform to certain conditions:

"The second party shall forfeit the payments so made and the property and machinery upon the property of the said first parties, and be released from all claims and demands arising under this contract."

While the phrase just quoted is part of the paragraph providing for payments, it was, I think, clearly the intention of the parties to the agreement that these provisions as to forfeiture were to apply to forfeiture for any cause. From the agreement, it is evident that it was the intent of the parties that the Bessie Gold Company should proceed at once to erect the mill and commence mining operations, in order that the payments might be made as agreed, within two years after the 1st of November, 1903. The erection and operation of this' mill was undoubtedly essential to the carrying out of the contract, and without it the agreement could not literally, or even generally, be complied with; and even though the two years in which the payments were to be made had not expired when the notice of forfeiture was given, the conditions existing on the property warranted it, for not only had the mill not been set up, but the Bessie Gold Company had ceased work, discharged its men, and practically abandoned the ground. Nor when the notice of forfeiture was served was any attempt made by the company to meet the demands of the owners. So that, even though it is true, as urged by the plaintiff, that the two-year period within which the payments were to be made had not lapsed, it is also true that the Bessie Gold Company had failed to comply with its contract to erect the stamp mill, and

had paid nothing at all on the purchase price, and in addition to this had actually abandoned work on the property, making it apparent that it was its intention to break its contract in every particular. So that, as I regard the contract and the acts of the parties to it, as disclosed by the evidence, the notice of forfeiture was properly given.

We now turn again to an examination of the phrase used in the paragraph of the agreement relative to forfeitures, which is as follows:

"Property or machinery upon the property of the first party."

It is contended by the plaintiff that this meant only such property as had become a fixture by being attached to the soil. Defendants insist that by this language it was contemplated that any machinery or property of the company which might have been placed upon the ground, whether it had become a fixture or not, was subject to forfeiture. The language of the contract itself seems to bear out this construction, and the acts of the Bessie Gold Company are a strong indication that they so understood it. The notice of forfeiture was duly given as provided in the contract, and after the notice had been served the Bessie Gold Company took no action whatever to comply with the terms of the contract or the notice. Several months passed, during which this machinery, which had been deposited by the company upon the ground, might have been removed. These months were the most favorable of the year for such action; and, if the Bessie Gold Company, it having determined, as Mr. Shelton testifies in his deposition, to abandon the option, interpreted the contract in the manner now urged by the plaintiff, it is but reasonable to presume that there would have been some attempt made to save an asset worth, as shown by the evidence, some $5,000; but no such attempt was made on the part of the company. In the interpretation of this agreement, this attitude of the parties toward it and their acts under it give much light as to what was intended by them.

The construction which the parties have by their acts placed upon an ambiguous instrument is entitled to great, if not controlling, weight in determining its proper construction. 17 Am. & Eng. Ency. of Law, 23, 24. Considered in this light, I am of the opinion that the parties intended that upon a forfeiture by the Bessie Gold Company whatever property or machinery the company had upon the ground, whether it had become a fixture or otherwise, was to be forfeited to the owners of the ground. To interpret this language of the contract otherwise would, I think, deprive the forfeiture clause of its effect, and no such construction should be placed upon a contract. 17 Am. & Eng. Ency. of Law, 18; Evans v. Sanders, 8 Port. (Ala.) 497, 33 Am. Dec. 279. The notice of forfeiture was duly given. The Bessie Gold Company acquiesced in the forfeiture. The evidence of the president, Shelton, indicates that before the notice was given the option or contract upon the property was abandoned.

The contention that the attitude of the company with respect to the contract was due to prior incumbrances upon the claims, which were discovered after the contract was entered into, is not, I think, sustained by the evidence. On the contrary, it appears that several of the directors knew of the existence of this mortgage before the contract was signed, and the search of the records in the recording office, which Shelton says was made, must have disclosed that fact. It may be that Shelton, personally, did not know of the mortgage; but it cannot be doubted, on examination of the record in this case, that the fact was personally known to some of the directors prior to the taking of the option. This of itself was sufficient. It also appears from the record in the case that the understanding was that this mortgage should be taken care of by the owners of the property and not by the company.

The owners of the mining claim were by the contract bound to do no more than they did in order to comply with the con-

tract and render the forfeiture clause effective. That once done, if the company failed within the 60 days to comply with the conditions of the contract, the forfeiture became complete, and the parties of the first part became the owners of the property and machinery of the company left upon their land, and the company no longer had any legal estate or interest in it. When this condition occurred, there was no interest of the company in the property, though the machinery still remained personalty that was subject to execution sale for the company's debts. Consequently that property was not the subject of attachment, "for no property may be taken in attachment that is not liable to seizure under the execution when issued." Drake on Attachment (7th Ed.) p. 223, § 244; Myers v. Mott, 29 Cal. 359, 89 Am. Dec. 49.

Judgment for defendants.